COLORADO CENT. R. CO. (AMES v.). See Cases Nos. 324 and 325.

COLORADO CENT. R. CO. (WHITE v.). See Case No. 17,543.

## Case No. 3,030.

### COLT v. MASSACHUSETTS ARMS CO.

[1 Fish. Pat. Cas. 108.][1]

Circuit Court, D. Massachusetts. Aug., 1851.

CONFLICTING PATENTS — USE OF IMPROVEMENT — PRIOR INVENTION — DATE OF INVENTION — INFRINGEMENT.

1. Where two patents conflict, the more recent must give way to the elder.

[Cited in Webb v. Quintard, Case No. 17,324; Monce v. Woodworth, Id. 9,706.]

2. The patentee of an improvement can not take possession of the invention improved upon. He must obtain the license of the prior patentee to use his improvement, or await the expiration of the elder patent.

3. If the prior invention relied upon to defeat a subsequent patent existed and was used, it is of no consequence whether it was patented or not, or whether it was abandoned or not. The defense of prior invention is not the same as that of prior use.

4. The date of the invention is the date of the discovery of the principle involved, and the attempt to embody that in some machine—not the date of the perfecting of the instrument.

[Cited in National Filtering Oil Co. v. Arctic Oil Co., Case No. 10,042.]

5. The law of infringement explained and illustrated.

[Cited in Norton v. Jensen, 1 C. C. A. 452, 49 Fed. 863.]

---

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

At law. This was an action on the case, tried before Mr. Justice Woodbury and a jury, for the infringement [by the Massachusetts Arms Company] of letters patent for "improvement in fire-arms," granted to Samuel Colt, February 25, 1836, reissued October 24, 1848 [No. 124], and extended in 1849, for seven years, from February 25, 1850. The claims of the patent are as follows:

"I. Combining a rotating chambered breech with the lock, in manner substantially as herein described, so that by the operation of lifting the hammer to cock the lock, the said breech shall be rotated to the extent required to bring a located chamber in the line of a barrel, preparatory to the discharge, substantially as described.

"II. Combining the rotating breech with the lock, by means of a key catch-lever, or the equivalent thereof, substantially as specified, so that, by the act of lifting the hammer to cock the piece, the said breech shall be liberated to admit of its being rotated, and then relocked, that it may be held in the proper position during the discharge, substantially as described.

"III. Placing the nipples of the rotating breech in recesses made in the rotating breech, or between partitions, substantially as described, as a protection to the caps, or touch-holes, from the effect of lateral fire, as described.

"IV. Connecting the barrel with the recoil shield, by means of the lock-plate below the rotating breech, substantially as described, in combination with the arbor or spindle connection, as described, whereby the parts are held together firmly, while, at the same time, they admit of a quick and easy disconnection."

C. L. Woodbury, E. N. Dickerson, and G. T. Curtis, for plaintiff.

R. A. Chapman, G. Ashmun, and Rufus Choate, for defendants.

WOODBURY, Circuit Justice, charged the jury as follows:

You have already understood, gentlemen of the jury, that the claim of the plaintiff against the defendants is founded upon a supposed violation, by the defendants, of the patent-right of the plaintiff. I trust you come to the consideration of this case with a due regard to the rights and privileges of both sides. They both claim under patents. They both have a right to have these patents protected, so far as they can be, without conflicting with each other; and when they conflict with each other, the more recent, of course, is to give way to the elder, because the one who patents an invention first, is entitled to the protection of the principle in it. over everybody else that patents it afterward. In the nature of things and common sense, this must be so. But that does not preclude—and that is the source of the difficulty in this case—any person subsequently from making an improvement on

that patent, by way of addition to it, or making it better and more useful.

But all that the person who does that—who makes an improvement—can protect under his letters patent, his subordinate patent, is that which is new, that which he has added; because if, by making an addition, or improvement, to an old patent, a party could get possession of the old patent itself, and use it without paying for it, no patent that was of any value would last a year—for such is the progress of science and of the arts, that some kind of improvement or other can be made upon everything. A party has a right to make an improvement, but all that he can patent is that which he improves—his own invention. He, therefore, must be careful, before using an addition, to get the license of the old patentee to use the old patent in combination with his improvement; otherwise, he must use his improvement alone, if he can, or, as he may often do with great safety, wait a year or two, until the old patent expires, when he would be free to use it in connection.

I recommend to you, gentlemen, to commence the investigation of this controversy, looking at this aspect of it, with a feeling of no hostility or prejudice against the defendants, because they happen to be a corporation, or happen to be a probable overmatch for any single individual; and you should not let your sympathies go beyond the rule of law and duty, because the plaintiff stands alone, and because he has evidently been struggling for fifteen or twenty years on this subject, to do something which might confer a benefit upon his country, and reward his own exertions. He can properly recover a verdict, if he is entitled to it; but if he is not entitled, he can not, however great may have been his sacrifices. You, therefore, should have no prejudice on the one side, or sympathies on the other, which could divert you from doing what is just and legal between these parties.

In the first instance, the plaintiff must make out his right—that he has a patent for a particular subject, which, he says, the defendants have violated; and then he must make out the violation of that patent by the defendants. In order to do.that, he has laid before you letters from the patent office, dated as early as February, 1836, in which he undertakes to describe a certain improvement which he has made by several combinations. At a subsequent time, in 1848, he amended his specification so as to describe his improvement with more clearness, or fullness, but the same invention; and then again, in 1849, he applied for and obtained an extension of seven years. The reason for conferring extensions, generally, by the officers of the government who are authorized to do it, is to reward the party, in some degree, for his skill and genius, when he has not, to appearances, been already re-

warded. It should not be granted, except in cases of valuable patents useful to the country, and where the parties have been unfortunate, and have not reaped from them the advantages they anticipated.

The government first authorizes some officers connected with the patent office to make the extension, and then congress interferes and makes further extensions, when they think the party has not been sufficiently rewarded. That is the whole controversy, in relation to extensions, about which you have heard so much. An extension being granted, whenever the party appears to have a valuable improvement, and has not realized from it sufficient to indemnify him, parties may object to that first, on notice being given: the controversy, then, is, whether the patentee has or not realized what is sufficient to constitute a reward.

In this case, the plaintiff amended his specification, and he has had it extended, so that it prima facie covers the time when this infringement is alleged to have taken place. I speak of this making out a prima facie case, notwithstanding any proof that, on the records of the country, there is a subsequent patent, for a similar subject, to the defendants. The plaintiff's patent overrides the defendants' entirely, when they are for the same subject, because it was granted earlier by the government, and therefore, no one who comes afterward, and gets a patent for the same thing, can take away his rights.

The government, by giving another patent, can not take away that of a prior patentee. They can no more take it away than you can take away the property of your neighbor. He has vested rights in it until the term expires; and, therefore, the government, when they give a subsequent patent which may cover a prior one, can not, in law, take away the rights under the prior patent. Whatever may have been the accident or mistake in granting it, and, although it may have covered other things which belong to a prior patent, yet the prior patent stands until the term expires; otherwise the government might take away any private property which exists, which a man had acquired, and give it to some person afterward by a mere arbitrary transfer. But that would not do. When a man obtains a grant from the government, he holds it as much as when he gets a grant or deed from an individual; and he can not be divested of it by a subsequent grant, unless he assents to it. Therefore, the law says, when a prior patent is offered —as in this case—it prima facie covers what it describes, and must stand, notwithstanding a subsequent patent may have been granted, which covers a portion of the same thing. It stands for what it is worth—for what it covers.

But there is another step to be taken in this case; and that is, notwithstanding the plaintiff's patent, so far as it goes, is to continue in full force until it expires, and until the extension expires, yet he can not recover of the defendants, unless it contains a principle which they have encroached upon. They may have done a great many other things, they may have made a great many other improvements, but the plaintiff must show that his patent contains a principle which the defendants (among other things) have adopted and used.

He has put a great many experts on the stand—and some who may not be called exactly experts in scientific matters, though they may be experts in the use of fire-arms —and proved by them that the arms made by defendants do contain a principle, among other things, which is involved in his. I do not propose to go into the details of the evidence, but you will recollect that several testified to the effect that the operation of the defendants' and plaintiff's pistols is the same in substance. It is conceded that they differ in form, in proportions, and in what are called mechanical equivalents. You understand what that means as well as the court; it has been explained to you by the experts.

I can only tell you as a principle of law, that where the difference is only in form or proportion to bring about similar results, or where it is only by using a mechanical equivalent, instead of what is used by the other, there is, in point of law, not that considerable difference in principle, or in operation, or in results, which the law holds not to be a violation of what preceded it; but, if it differs in something beyond mechanical equivalents—if it differs in something beyond form and proportions—if the difference in the parts of a pistol where it is charged is very considerable—the plaintiff can not claim that as similar to his.

Look a little at this in a practical point of view, and as practical men. Although there may be, for instance, in a subsequent patent, two things which differ from the prior patent in something beyond mechanical equivalents, form and proportions—and though they may be improvements, and, therefore, are not to be treated as violations of the other— yet, at the same time, it is to be considered, that if there is a third thing introduced in the defendants' which is covered by the plaintiff's patent, the party is liable for that third, although not for the other two.

Therefore it becomes important, in considering the subject throughout, that you consider these five claims of the plaintiff. They are separate combinations. They are not five things combined into one. They are five, constituting one patent, but each of them is a separate combination, as you will see by the patent. If they were all one combination simply, and not set out as, and not in substance, different combinations, the defendants, in order to infringe, would have to violate the combination as a whole. But where there are five separate combinations,

as there are in this case, the first may be violated, the second may be violated, but the third need not; because they are separate combinations, and the language of the claims is, first, combining the rotating chambered breech with the lock, etc., third, placing the nipples, etc. They are each distinct, and do not all go to form a whole as a combination. I am instructed to request you to consider them separately, and I do so. If the defendants use one of them it is enough; and it is of no consequence to this result whether they use more than one, or more than two, except in respect to damages. When you come to that subject, it may be of some importance to discriminate how many of them they violate, because, according to the importance of that one combination, and according to the various combinations they may encroach upon, may be the amount of damages to be recovered.

I have said that I am going on to see how far the plaintiff makes out his prima facie case, because the defendants have offered the testimony of experts, who swear that their pistols are unlike the plaintiff's in principle, and that, in their opinion, they do not encroach. All that is to be considered when you come to make up your verdict. But, if the plaintiff has shown a patent which the court considers legal; if he has shown an extension which is prima facie valid; if he has shown, by other experts, that the defendants' machine, patented ten or eleven years after his, however much more it may cover in some particulars, encroaches upon his, and that his machine is useful—he lays the foundation for damages, prima facie.

As to the utility, which is the only other point to be considered under this aspect of the case, there has been but one opinion expressed upon both sides—that Colt's firearms have been regarded by those most skillful in the use of them, for many years, since 1836, as very valuable and very effective; that their utility, in this respect, has not only been tried in different wars and different services, but it has been examined by the government and favorably acted upon; and that, in a controversy between the defendants, or the person under whom they claim, and Colt, where the former interposed against the plaintiff having a contract for a considerable number of these arms, the most experienced and intelligent officers reported decidedly in favor of the plaintiff's arm. If the prima facie case is thus made out, all that will remain on that prima facie case would be the damages; and, as I remarked to you, they would be influenced by the number of the combinations violated, and their importance.

(Mr. Curtis remarked that the question of damages was not to be considered by the jury.)

That is so much easier, gentlemen, for you and for me. The question of damages the parties have settled among themselves; it is much better that they should be so settled. I was about to repeat, what I had occasion to say lately in this very district, in relation to damages; that I am determined, so far as regards myself, that if a party has clearly violated the patent of another, he shall not pay less than he would if he had contracted to use the machine during the time he had been using it. The idea can not be tolerated in a civilized community, that a man, by trespass, shall use a machine for a less sum than he would have to pay for its license. Notwithstanding all this, the defendants say, and they have a right to say, that, conceding their patent to be of more recent date than the plaintiff's, and, therefore, bound to yield to it, as between them, on the records of the patent office, yet that the plaintiff was not the original inventor of those improvements which he has covered by his patent.

It is true they are right in thinking that, if they support it by facts; and it is true that although the government gives the patentee a patent which he supposes is original, it is open, by the act of congress of 1836 [5 Stat. 123], and all other acts which preceded it, to be impugned and impeached. A patentee is exposed to have his patent shown not to be the first in date of that character: and then, however wrong or right the defendant is in his course, yet the foundation is struck from under the feet of the plaintiff as having been the original inventor, if the defendant is able to show that there were prior machines used, containing in substance the principle involved in the plaintiff's. It is no matter whether those prior inventions were patented or not, if they existed, if they were discovered, if they were used.

The only effect of patenting, as regards this aspect of the question, is, that it rather evinces an idea on the part of the person who made this invention, that there was something in it, that it was valuable, and that he did not mean to abandon it to the community; therefore, he protects it by a patent; supposing it valuable, he intends to reap some benefit from it. Whereas, if he set up an invention many years ago, and did not patent it, but let the world use it, there is some indication that he supposed he had nothing very valuable or important. But it goes as far to impeach the plaintiff's machine, if it existed, as if it existed and was patented. And it is of no consequence, if it existed, that the party did not choose to patent it. In some aspects of the patent law, it might be important to show that it had been abandoned; that is, when the party undertakes to rely on priority of use to defeat the plaintiff. But here the reliance is not on prior use; therefore, it is of no consequence whether it is abandoned or not, but whether it was the prior invention. When I say "it," I mean a machine involving the same or a similar principle.

A great many other considerations have been pressed in connection with this view of the subject, but I believe there is no way in which you will be able to comprehend more clearly whether there was a prior invention, similar in substance to Colt's than to see what Colt's was, before you compare it with others, or others with Colt's. What did Colt do? He undertook, undoubtedly, from all that appears in the case, and from the specification, to get the power, through a revolver, of having more discharges in a short space of time than by a single barrel. That is one great essence of this principle of revolving fire-arms. He introduced revolvers, undoubtedly, which might be fired oftener within the same space of time. Another object which he seems to have developed in his specification is, that he should do this with as much safety as possible, by means of nipples, placed between partitions, or in recesses, so that the fire should not communicate from one barrel to the other. In doing all this, you will perceive (as revolvers can not be had conveniently, without a pretty large magazine and barrel besides), that, for a pistol, it would necessarily make the arm heavy; one of the general objects connected with a revolver would be to have it no heavier than was necessary for security. With five or six barrels, it would be necessary to have more weight than with one or two. He must see, therefore, as a general principle, to make these arms effective, that they contain weight and strength enough for security, but at the same time that they should not be more cumbersome than necessary to accomplish the object pointed out. All these general principles, Mr. Colt seems, from his specification, to claim.

He seems to have sought, in his combinations, some way to cock, uncock, turn the revolver, and hold it in its place, while the discharge was going off. If he could not do that, although he had the cylinder with six chambers, it would be a mere child's toy. He, therefore, sets out, in his first claim, that he combines the breech with the lock, so that by lifting the hammer to cock the lock, the cylinder shall be turned; and he goes on to enlarge upon that in the second claim; the cylinder must be held firm for a time, in order to effect the discharge; and then, after the discharge, he wants to turn it again, and therefore there must be some way to liberate it, which is the second combination. These are the two leading combinations that he sets out in his specification; then there is a third in regard to the nipples and partitions; the fourth and fifth are subordinate matters.

The first inquiry, after seeing what his combinations are, is whether there were any arms, preceding his, which involve and unite these different improvements which he sets out that he had made, and which were the same in principle. A great deal has been said here about "methods" in the specifications. The patent is not for a method, merely, but for a machine operating in that method or mode, or form, which the patent covers. Now, was there a former fire-arm which contained this first combination in substance, and the second in substance, and the third? or, was there one which contained any one of them? If there was a machine which contained any one of them, it would precede him on that one, but only on it. If there is any one of the five which did not exist before him in that form, he is entitled to recover on that. You are now prepared to take up the different fire-arms which, it is said, existed before, and were similar in substance to the plaintiff's. The only gun, according to my minutes, which is contended to be of an earlier date than Colt's invention, provided he made it in 1831, as he contends he did, is what is called the French or Coolidge gun, about which you have had a good deal of testimony—some from the person who manufactured and sold it pretty extensively, and was interested in the use of it. That was patented abroad about 1818, and published in 1825, so that it is early enough in date; and the only question is, whether the combination and the machinery used there, to effect the object, was the same in substance or principle with that in Mr. Colt's.

It is contended, on the one hand, that it was similar, and experts have been put on the stand to prove it, some of whom speak of a spring in it for revolving the chamber, as different from the common spring which is used in fire-arms, being acted upon, and making a movement by that action, and by the inherent power of the spring; in other words, it was a coil spring, wound up by hand. On the part of the plaintiff, experts say that this kind of a spring, and the mode of operating it, was different from the mode of operating in Colt's by drawing up the hammer, and in that way causing the chamber to revolve without any coil spring.

On that subject, I am requested to charge you whether in point of law that coil spring is the same with the common spring which is often put into fire-arms. I must confess my inability to do it, unless you first find the fact for me, and that fact I submit to you. Whether it is the same in substance or principle, depends on whether it is the same kind of instrument or not, and whether it acts in the same way in substance, and produces the same result in substance. If it does, you may consider it, in law, the same in principle. But, on the contrary, although called a spring, if it operates on a principle different from springs usually employed, if the results are not the same, if it does not act in the same manner, if it is to be wound up by hand in order to make it continue to operate, I should tell you it is not the same in point of law.

Things may go by the same name, and not be the same in substance or principle. We talk about the main spring of a watch,

but it is a very different thing from some springs; yet it is a spring. Whether it is like others in substance or not, is a question for the jury to determine, and not the court; it is a question of fact. But I would recommend you to look at this question, as to the similarity of the French or Coolidge gun, in another view. Was that gun, or rifle, made so that it could operate as Colt's does? Is the hand used in it no more than in Colt's? In Colt's the hand is used to draw the hammer and cock the piece, and for nothing else, so that you can go on revolving it ad infinitum; of course, some one must use the hand to reload. Did the Coolidge gun operate in that way? Must you, or must you not, in that gun, use the hand to wind up the spring, as well as to draw back the hammer, before your can turn the cylinder? Must you not use the hand there again, and wind up the spring?

But there is another consideration connected with this which possesses some importance, and that is—whether it was different or not —did it succeed like this of Colt's? If it was the same in substance—if it was the same in principle—would it not have succeeded as well, and did it succeed as well? On that you must go to the testimony of Mr. Collier. He said, that after making a small number, compared with the whole, he became satisfied, as all others who used the arm did, that this spring was inefficient and unnecessary in his gun, and that it was flung aside entirely, and the barrels have ever since been turned by the hand at every discharge. These are considerations to be weighed in connection with the opinion of experts. If you believe that that spring was the same in substance as Colt's—that it operated as well as Colt's—that it was not flung aside, and still continues to operate—if you believe it could be used originally with no more employment of the hand in connection with it than in Colt's, you are at liberty, and ought, probably, to come to the conclusion, that it contained in substance all that is in Colt's. But, if you do not believe these things—if you believe the reverse was true, then this should not be considered as taking away from Mr. Colt his merits as the original inventor.

I say this is the only gun which is pressed upon you earlier than 1831, the supposed date of Colt's invention. As to that date, however, there seems to be conflict, to a certain extent. As I stated, in your hearing, in the progress of the case, while the testimony was being put in, the date of the invention is the date of the discovery of the principle involved, and the attempt to embody that in some machine—not the date of the perfecting of the instrument. It was on that account that I did not consider it pertinent to go into the testimony as to the progress of the perfecting of the machine. If the invention was made —if it was set forth in a machine which

would, and did discharge a fire—that is all which is necessary to constitute the invention. But the party can not get a patent until he perfects it in some sense of the word—that is, until he goes on and makes improvements to render it practical and useful—for it is one element of a machine, necessary to sustain a patent, that it is useful. It is a very different thing to sustain a patent, when it is attacked by another patent, from what it is to show the invention compared with a prior invention; for invention is the discovery of the main principles of the machine, and embodying it in wood or iron, or of whatever it is to be composed, and making it act. Perhaps I go quite too far in requiring all these things; but such is the state of society, and such is the pirating principle which governs many, that it is necessary. I have tried a case here in which, when a party was perfecting a machine, another man stole into the workshop, examined the principle, got the dimensions, and pirated the principle before the inventor had an opportunity to perfect the machine in any sense of the word. He could not get out his patent until he got his machine made, and so it would work; but he could protect himself against a pirate who encroached upon him.

In order to settle the point of invention here, before you go any further, you have the testimony not only of Mr. Chase, but some half-a-dozen who saw this invention, and saw two specimens in iron or steel, as early as 1831. Those specimens and drawings are produced, and the witness (Mr. Chase) swears that they have been in his possession ever since, until a few months ago. To contradict that, I do not remember any testimony.

There are some circumstances which ought to be weighed, as far as they should be, against this positive proof, coming from a variety of sources. One is, that although Mr. Colt considered his machine then perfected so as to entitle him to a patent for it, and started for Washington with drawings and models, he did not get it patented until 1836; and that this delay is a circumstance which would go to raise some probability that he had not made his invention perfect. If there was not positive testimony that he had made it, this would be entitled to some consideration; as it is, you must give it such weight as it deserves.

For, in addition to this, the plaintiff produces the testimony of Mr. Elliott, that in 1832 Mr. Colt went to Washington with his fire-arm, and with drawings, for the purpose of taking out a patent. In 1831 the transaction took place at Hartford, and the invention in 1832 had made such progress as that he thought he was entitled to take out his patent; and Mr. Elliott then thought it a beautiful machine, and that it would be useful, and recommended the delay, in one sense of the word showing that the circumstance about the delay is not entitled to the weight it might usually have. Mr Elliott recom-

mended the delay, and that he should go to Europe and take out a patent abroad, because fire-arms are unfortunately needed all the world over, and needed more in Europe than here, although we use them pretty freely sometimes; and also that he should file a caveat here, setting out, substantially, his claims, and warning the patent office against issuing a patent to anybody else for a like thing; that caveat, they say, was burned in the patent office in 1836.

If you believe that the plaintiff's invention was made in 1831 or 1832, all the others, except the French gun, seem to be of a subsequent date. The Smith gun, which is the one pressed most strongly as to date, was not finished, according to the mass of the testimony, until 1833—some considered that it was in 1834—but it was not finished, so as to be an operative piece, until 1833; and if so, it is wholly immaterial to go into any consideration as to how near it resembled the plaintiff's, for if it was of subsequent date, it does not impair or impeach his.

Mr. Colburn admits that his gun was not made until 1833; his patent is dated in 1833. It had a double trigger. But, if it was not until 1833, there is no use of going over these various considerations, traveling to Michigan, to Auburn, and back again, and seeing all these processes and contrivances alleged to have been resorted to, to color, and rust up, and fit the gun for the trial, and the explanation which has been made why this was done, and that no fraud was contemplated, and no improper agency was exerted about it; all these are of no consequence, if it was as late as 1833, and Colt's was invented in 1831 or 1832.

You see why the point of invention is so important, and not that of patenting; because if Colt's was invented in 1831 or 1832, and was known to several persons in Hartford, although he attempted to keep it as quiet as he could, he was probably pirated upon by these persons, rather than they pirated upon by him, especially if Colburn was at Hartford. The importance of showing that these other improvements and machines, similar to Colt's, were before, is, that if they existed before, he may have copied them; but if all which were similar in principle existed after, he did not copy from them, but they were likely to have copied from him. But it often happens that they do not copy at all; that they are a sort of independent original inventors; yet such is the law that the date of the invention becomes very material, because it is the earliest in date that is then to succeed. The Ohio gun was as late as 1834 or 1835; and if you believe it was several years after Colt's, it is not important to go into the differences.

I do not propose to say anything more on this subject, except to have you put to your brethren, Mr. Foreman, when you return to your room, after reviewing the evidence, this general consideration: Did any of these guns succeed as the plaintiff's did? If they did, it raises a strong presumption, in addition to any testimony, that they were similar. As I said about the French gun, did they operate as Colt's did? as successfully? did they continue to operate? If they were the same in principle, another question occurs in connection with that fact, and which you will consider, and to which you will give its due weight, and no more; whether you have heard on the stand, in the progress of this case, or anywhere else, of the power and effectiveness of Smith's rifles in the world; have they crossed the Atlantic, or penetrated the wilds of America? Coolidge's guns—used now without any thing to turn them but the hand—do you hear or read of them as circulated through both hemispheres? The Ohio gun—the Colburn gun—have they succeeded? are they known? do the experts, the men of science here, speak of them as displaying something new, beautiful and successful? All this is to be considered.

On the other hand, it is true, things may fail for a time, and not eventually—not entirely; the parties may not choose to patent them, even if they gain something valuable. But what is the presumption? If these great improvements were made before Colt made them, what became of them; why did they disappear any more than his, if they were the same in principle and in substance? That is to be considered and weighed with the other testimony, and that importance given it which seems rational under all the circumstances of the case.

I hasten to another consideration connected with this subject—as to the extension, in the procurement of which the defendants aver that there was some moral fraud, and that it should, therefore, vitiate a recovery here by the plaintiff. As you heard in the course of the trial, the commissioner, in acting on this subject, acts under a law of congress; and it is his business to conform to the law; it is his business not to make the extension until he is satisfied that the party has not been sufficiently rewarded, and when he is so satisfied, it is his duty to grant the extension, making it in conformity to the law.

It is not the case of a suit between A and B. It is a proceeding pending between the patentee and the government; but, with abundant caution, the government says, in its law, that when this application is made, the commissioner shall give notice to the world, that they may come in and show why it should not be extended. In this case, notice was given, and a certain time fixed for the purpose. Nobody appeared.

Probably some opposition was expected, from the adjourning of it; and the adjournment may have been made for the purpose of receiving other testimony, the testimony not having been prepared until it was ascertained whether there would be opposition testimony, as to expenditures and receipts, to see how the balance stood. Notice of the

day had been given; anybody disposed to make opposition could do so; no one chose to go; I do not know that the commissioner does wrong, after that, whenever he has evidence that the party was not remunerated, in making an extension. It ought to be made seasonably, that the party may know whether he is to have seven years more; and I do not know that anybody has a right to complain, if he does not choose to go there and make opposition, at the time mentioned.

But, whether he did right or wrong, the extension is legal; it is valid as regards the original patentee, and nobody has a right to complain, in a moral, or any other point of view, who got notice and did not choose to go and attend to it, whether because he did not intend to show that Mr. Colt had made a great deal out of it at that time, or because he thought it more liberal to let the extension take place, or that it was very likely to take place if he did oppose it, on account of the great merit of the machine. Whatever may have been the cause, he did not appear at the proper time, and the commissioner made the extension; it is, therefore, in point of law, valid, and I see in it no evidence of fraud. If there was any fraud at all, it would be in the commissioner, rather than anybody else. The jury can not find fraud without evidence. It is said, too, there was an assignment, and therefore Mr. Colt could not recover. Counsel have not dwelt upon it, in the close, on either side.

It appeared, in a subsequent stage of the case, that the interest which was assigned has been reassigned, in conformity with the laws of New Jersey; and therefore he is entirely justified in recovering, if he makes out his case in other respects. I would not instruct you that the agreement produced here would, of itself, revest the title in Mr. Colt; because, I think that the meaning of the agreement is, that if the Patent Arms Company ceased to make these arms, they licensed Mr. Colt to go on and make them, instead of themselves. It is rather a license than a revesting of the interest. But I do instruct you that this reassignment is in law, valid, and is enough without going to the other.

There is one other consideration which has been suggested in the progress of the trial—that the plaintiff claims all modes for doing the thing, and therefore he claims too much. In point of law, the claim must be construed to mean the modes which he points out for his operations, and not any and all modes. It is true the operation of the law is such, that any mode which is equivalent to the one he points out—which is similar—is covered by his patent, when he claims a particular mode; but in his patent he claims only what he points out, and that covers all which are similar and analogous, or which vary only in form.

Having made this suggestion, I come now to the last consideration, which is considered by the defendants of considerable importance—the point of infringement. I have already suggested to you what are the leading principles which would govern in an infringement. The defendants must use something which is one of the combinations of the plaintiff's, in order to infringe; they must have taken some one of the combinations, and used it. Adding and improving as much as they may, if they have taken one, they are liable for the use of that one.

It is true that there may be a distinction of another kind; if a defendant does not add, but makes a change—improves one part of the machinery used—he may do that, and not be liable in the common acceptation of the term, and it might not be considered as a separate and additional improvement, but a change which is made by itself. If there be improvements, for instance, of the bevel-gear and ratchet, that has nothing to do with Mr. Colt's mode of moving the cock, and fastening the revolver, and all that. There is a cog put in there which is new; it is there, in and of itself, whether it is an improvement or not. If it is an improvement, it can be protected as such; but it does not enable them to use other portions of Mr. Colt's patent—other portions, which they never invented, and never got a license to use.

Experts throw some light upon this point, as to whether the defendant's pistol does not use, in substance, what is in Colt's. It may use more or less in some particulars, but does it use what Colt's uses, and what he invented in substance—some efficient part of the machinery? Messrs. Mapes and Blanchard swear that it uses the same in substance as Mr. Colt's, with a variation of form, and of mechanical equivalents. On the contrary, witnesses on the part of the defendants seem positive that it is not similar in substance.

There is another consideration in connection with this—and where you can find general considerations to advert to, perhaps they are safer than contradictory testimony. Do you, or do you not, believe that Wesson invented the machine or pistol—that he would ever have made it, if he had not seen and profited by Colt's in doing it; and was he not trying to defeat the renewal of Colt's patent in 1850? He was there by his counsel. He had had Colt's to see for twelve years or more—could he have made his unless he had seen and profited by it? Does not that raise the presumption? That is for you to consider. If not, why did he want to defeat the extension of Colt's? Why, if Colt's had not been extended, it would have expired, and he and everybody else could have used it with impunity!

I do not know that there is much in the consideration pressed on the one side or the other about which is superior. That is not the question; it is whether they operate upon a similar principle. Though, on that subject, if you think right to advert to it, you

can take not only the testimony upon both sides, but that of the board of ordnance, which examined both, to see which was superior, and decided, for reasons which have been laid before you, that Colt's was superior to the defendant's. I do not consider that a question of great magnitude; though, if the jury choose to go into it, in connection with other matters, they have a right to do it. I believe I have suggested to you every thing which it is proper for me to say on the subject. Doubtless other considerations will occur to yourselves. I have no wish, in this case, but that you should examine it carefully, and render such a verdict as your sense of duty dictates.

The jury found a verdict for the plaintiff.

[NOTE. For other cases involving this patent, see Colt v. Young, Case No. 3,032; Young v. Colt, Id. 18,155.]